# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2016 Term

No. 15-1149

**FILED**

**May 18, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## STATE OF WEST VIRGINIA EX REL.
## FORD MOTOR COMPANY,
Petitioner

## V.

## HONORABLE WARREN R. MCGRAW,
## JUDGE OF THE CIRCUIT COURT OF WYOMING COUNTY; AND
## DANNY S. WELLMAN, ADMINISTRATOR OF THE ESTATE OF
## JARRED S. WELLMAN,
Respondents

---

### Petition for Writ of Prohibition

### WRIT GRANTED AS MOULDED

---

Submitted: April 6, 2016
Filed: May 18, 2016

Jonathan D. Hacker                     Patrick E. McFarland
*Pro Hac Vice*                             Patrick E. McFarland, PLLC
Bradley N. Garcia                      Parkersburg, West Virginia
O'Melveny & Myers, LLP                 Christopher J. Heavens
Washington, D.C.                       Heavens Law Firm, PLLC

Michael Bonasso
Elizabeth L. Taylor
Mitchell B. Tuggle
Flaherty, Sensabaugh, Bonasso, PLLC
Charleston, West Virginia
Attorneys for the Petitioner

Charleston, West Virginia
Jamie D. Jackson
*Pro Hac Vice*
Atlee Hall, PLLC
Lancaster, Pennsylvania
Attorneys for the Respondent,
Danny S. Wellman

Christopher L. Slaughter
Steptoe & Johnson, PLLC
Huntington, West Virginia
Attorney for Amicus Curiae,
West Virginia Chamber of Commerce

Todd S. Wiseman
The Wiseman Law Firm
Vienna, West Virginia
Attorney for Amicus Curiae,
The Center for Auto Safety

L. Lee Javins, II
Bailey, Javins & Carter, LC
Charleston, West Virginia
Attorney for Amicus Curiae,
The Attorneys Information Exchange Group

JUSTICE DAVIS delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "When a court is attempting to proceed in a cause without jurisdiction, prohibition will issue as a matter of right regardless of the existence of other remedies." Syllabus point 10, *Jennings v. McDougle*, 83 W. Va. 186, 98 S.E. 162 (1919).

2. "'"""The standard of jurisdictional due process is that a foreign corporation must have such minimum contacts with the state of the forum that the maintenance of an action in the forum does not offend traditional notions of fair play and substantial justice.' Syllabus Point 1, *Hodge v. Sands Manufacturing Co.,* 151 W. Va. 133, 150 S.E.2d 793 (1966)." Syllabus point 1, *Hill by Hill v. Showa Denko, K.K.*, 188 W. Va. 654, 425 S.E.2d 609 (1992), *cert. denied*, [508] U.S. [908], 113 S. Ct. 2338, 124 L. Ed. 2d 249 (1993).' Syl. pt. 1, *Norfolk Southern Ry. Co. v. Maynard*, 190 W. Va. 113, 437 S.E.2d 277 (1993)." Syllabus Point 6, *State ex rel. Bell Atlantic-West Virginia, Inc. v. Ranson*, 201 W. Va. 402, 497 S.E.2d 755 (1997).

3. "A court must use a two-step approach when analyzing whether personal jurisdiction exists over a foreign corporation or other nonresident. The first step involves determining whether the defendant's actions satisfy our personal jurisdiction statutes set forth in *W. Va. Code*, 31-1-15 [2015] and *W. Va. Code,* 56-3-33 [2012]. The second step involves

determining whether the defendant's contacts with the forum state satisfy federal due process." Syllabus point 5, *Abbott v. Owens-Corning Fiberglass Corp.,* 191 W. Va. 198, 444 S.E.2d 285 (1994), *superseded by statute on other grounds as stated in State ex rel. Ford Motor Co. v. Nibert*, 235 W. Va. 235, 773 S.E.2d 1 (2015).

4. "The Due Process Clause of the Fourteenth Amendment to the United States Constitution operates to limit the jurisdiction of a state court to enter a judgment affecting the rights or interests of a nonresident defendant. This due process limitation requires a state court to have personal jurisdiction over the nonresident defendant." Syllabus point 1, *Pries v. Watt*, 186 W. Va. 49, 410 S.E.2d 285 (1991).

5. A court may assert general personal jurisdiction over a nonresident corporate defendant to hear any and all claims against it when the corporation's affiliations with the State are so substantial, continuous, and systematic as to render the nonresident corporate defendant essentially at home in the State.

6. "When a defendant files a motion to dismiss for lack of personal jurisdiction under *W. Va. R. Civ. P*. 12(b)(2), the circuit court may rule on the motion upon the pleadings, affidavits and other documentary evidence or the court may permit discovery to aid in its decision. At this stage, the party asserting jurisdiction need only make a *prima*

*facie* showing of personal jurisdiction in order to survive the motion to dismiss. In determining whether a party has made a *prima facie* showing of personal jurisdiction, the court must view the allegations in the light most favorable to such party, drawing all inferences in favor of jurisdiction. If, however, the court conducts a pretrial evidentiary hearing on the motion, or if the personal jurisdiction issue is litigated at trial, the party asserting jurisdiction must prove jurisdiction by a preponderance of the evidence." Syllabus point 4, *State ex rel. Bell Atlantic-West Virginia, Inc. v. Ranson*, 201 W. Va. 402, 497 S.E.2d 755 (1997).

7.      "Personal jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause and can be exercised without the need to show additional conduct by the defendant aimed at the forum state." Syllabus point 2, in part, *Hill by Hill v. Showa Denko, K.K.*, 188 W. Va. 654, 425 S.E. 2d 609 (1992).

8.      A court may assert specific personal jurisdiction over a nonresident defendant to hear claims against the defendant arising out of or relating to the defendant's contacts or activities in the state by which the defendant purposefully avails itself of conducting activities in the state so long as the exercise of jurisdiction is constitutionally fair and reasonable.

9. The purposeful availment requirement of specific personal jurisdiction ensures that a defendant will not be haled into a jurisdiction as a result of isolated, fortuitous, or random acts.

10. The specific personal jurisdiction fairness and reasonableness inquiry may, in appropriate cases, include, but is not limited to, considering the burden on the defendant, the interests of the state, the interest of the plaintiff in obtaining relief, the interstate judicial system's interest in obtaining efficient resolution of controversies, and the shared interests of states in furthering fundamental substantive social policies. The analysis is case specific, and all factors need not be present in all cases.

**Davis, Justice**:

The petitioner herein and defendant below, Ford Motor Company ("Ford"), requests this Court to issue a writ of prohibition to prevent the enforcement of orders entered October 5 and 21, 2015, by the Circuit Court of Wyoming County and to dismiss Ford from the underlying civil action. By those orders, the circuit court denied Ford's motion to dismiss the underlying complaint against it for lack of personal jurisdiction. Before this Court, Ford contends the circuit court erred by refusing to dismiss it from the litigation because Ford is a nonresident corporation over which the circuit court lacks personal jurisdiction.

Upon a review of the petition; the response of the respondent and plaintiff below, Danny S. Wellman, Administrator of the Estate of Jarred S. Wellman, Deceased; the record; and the pertinent authorities, we grant the requested writ of prohibition, as moulded, and remand this case to the Circuit Court of Wyoming County for further proceedings consistent with this opinion.[1]

---

[1]We acknowledge the valuable contribution of amici West Virginia Chamber of Commerce, The Center for Auto Safety, and The Attorney's Information Exchange Group who submitted briefs to this Court.

1

## I.

## FACTUAL AND PROCEDURAL HISTORY

Jarred Wellman, a West Virginia resident, was killed on March 4, 2013, in a one-car roll-over crash near Ghent, West Virginia. He was operating a 2002 Ford Explorer. It is alleged that, during the crash, the Ford Explorer's safety seatbelt released webbing, the roof crushed, the driver's window shattered out, and Jarred Wellman was partially ejected from the vehicle such that his head and upper torso struck the pavement resulting in his death due to head trauma.

The Ford Explorer was assembled at Ford's manufacturing facility in Louisville, Kentucky. It was sold to Sunrise Ford Company ("Sunrise") in Fort Pierce, Florida. The Ford Explorer arrived at Sunrise on December 19, 2001. Sunrise sold it to a Florida resident on January 21, 2002. Ramey Automotive Group, Inc. ("Ramey") in Beckley, West Virginia, acquired the Ford Explorer with 67,017 miles in May 2009 and offered it for sale. Ramey performed safety inspections, engine checks, battery system checks, engine electrical checks, accessory installations, and other services on the Ford Explorer during 2009 and 2010. MacArthur Auto Body & Repair Shop ("MacArthur") in Beckley, West Virginia, purchased the Ford Explorer from Ramey. Jarred Wellman purchased the Ford Explorer from MacArthur.

2

The respondent herein and plaintiff below is Danny S. Wellman ("Mr. Wellman"), the father and administrator of the estate of Jarred Wellman. Mr. Wellman is a West Virginia resident. Mr. Wellman filed a complaint in the Circuit Court of Wyoming County asserting causes of action grounded in claims of product liability, negligence, and breach of warranty against Ford Motor Company and Ramey.

Ford was served with the summons and the complaint on February 10, 2015. Ford removed the case to the United States District Court for the Southern District of West Virginia and reserved the right to challenge personal jurisdiction. On March 31, 2015, Mr. Wellman filed a motion to remand the action to the Circuit Court of Wyoming County. On June 5, 2015, the federal district court entered an order granting the motion for a remand. The remand was stayed pending a determination of attorney's fees and costs incurred as a result of the improvident removal. On September 11, 2015, a second order was entered by the federal district court whereby the stay was lifted, the case was remanded, and the issue of attorney's fees and costs was reserved. During the period of time between the two orders of the federal district court, Mr. Wellman and Ford negotiated regarding various discovery matters, protocols, stipulations, and confidentiality issues. The two parties also negotiated and agreed to a protocol for a vehicle inspection which governed an inspection of the Ford Explorer that took place in August 2015.

3

The federal district court order lifting the stay and remanding the action was filed in Wyoming County Circuit Court on September 18, 2015. Thereafter, a Stipulated Sharing and Non-Sharing Protective Order and a Stipulation and Order Regarding Access to www.Forddocs.com, were signed by the trial court judge on September 16, 2015, and filed by the clerk of the court on September 21, 2015. A Notice of Scheduling Conference was entered on September 22, 2015. On September 23, 2015, Ford filed a Motion to Dismiss for Lack of Personal Jurisdiction with an accompanying memorandum of law and supporting affidavits from a Ford franchise strategy manager and a Ford retail communications manager. The motion to dismiss was noticed for a hearing to be held on October 28, 2015.

On October 5, 2015, prior to the time that Mr. Wellman's response in opposition to the motion to dismiss was due and prior to the scheduled hearing on the motion, the trial court entered a one paragraph order denying Ford's motion to dismiss. On October 15, 2015, Ford submitted a motion requesting that the trial court issue an order with findings of fact and conclusions of law so that it could proceed to file a writ of prohibition with this Court to challenge the exercise of personal jurisdiction as to Ford. Ford also requested that the trial court stay further proceedings pending resolution of the writ of prohibition.[2]

---

[2]The trial court granted Ford's motion to stay by order entered October 21, 2015.

4

Again, without a hearing and with no opportunity provided to Mr. Wellman to respond or to submit material to make a record, on October 21, 2015, the trial court entered its Order Setting Forth Findings of Fact and Conclusions of Law that Support the Court's Order Denying Motion to Dismiss. As to findings of fact, the trial court, among other things, found that "Ford Motor Company is a global operation," Ford manufactured the vehicle involved, and Ford "essentially claims" that it does not do business in West Virginia.

Regarding conclusions of law, the trial court found that, based upon the judicial history of the litigation, granting the motion to dismiss would "effectively deprive" Mr. Wellman of his constitutional right of access to open courts for injury done to him. The trial court cited to Article 3, section 17 of the Constitution of West Virginia which provides that "[t]he courts of this State shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." Also cited in support of the denial of the motion to dismiss was the Due Process Clause of the Constitution of West Virginia, Article 3, section 10, which provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

Further, the order provided that to interpret the Constitution to allow summary dismissal of a claim "based upon some complex and intricate interpretation of the law"

5

would violate the intent of the Constitution to guarantee the right to have one's case heard in court and decided by one's peers. The trial court concluded that it is the "ultimate absurdity" to suggest that Ford, the leading automobile manufacturer in the United States for more than a century, does not do business in West Virginia. The order provided that "[t]o hold Ford Motor Company does not do business in West Virginia to a sufficient degree to be 'at home' in West Virginia and be required to respond in our courts meets the ultimate [absurdity] definition from Black's Law Dictionary. . . ." Finally, the trial court concluded that "[t]he Ford emblem and logo, which may have existed for well over one-hundred years, is notably proper for the world's leading manufacturer of automobiles in that it is a globe of the world. . . ." From this adverse ruling, Ford seeks extraordinary relief from this Court to prohibit the trial court from enforcing its order.

## II.

## STANDARD FOR ISSUANCE OF WRIT

This Court has original jurisdiction in prohibition proceedings pursuant to Article VIII, section 3 of the Constitution of West Virginia. That original jurisdiction is recognized in Rule 16 of the West Virginia Rules of Appellate Procedure and by West Virginia Code §§ 51-1-3 (1923) (Repl. Vol. 2008) and 53-1-2 (1933) (Repl. Vol. 2008). "A writ of prohibition 'lies as a matter of right whenever the inferior court (a) has [no] jurisdiction or (b) has jurisdiction but exceeds its legitimate powers. . . .'" *State ex rel.*

6

*Farber v. Mazzone*, 213 W. Va. 661, 664, 584 S.E.2d 517, 520 (2003) (quoting *State ex rel.*

*Valley Distrib., Inc. v. Oakley*, 153 W. Va. 94, 99, 168 S.E.2d 532, 535 (1969)). As this

Court specified in Syllabus point 10 of *Jennings v. McDougle*, 83 W. Va. 186, 98 S.E. 162

(1919), "[w]hen a court is attempting to proceed in a cause without jurisdiction, prohibition

will issue as a matter of right regardless of the existence of other remedies." However, relief

in prohibition is inappropriate where jurisdiction turns on contested issues of fact. *See*

*Health Mgmt., Inc. v. Lindell*, 207 W. Va. 68, 72, 528 S.E.2d 762, 766 (1999); *Lewis v.*

*Fisher*, 114 W. Va. 151, 154, 171 S.E. 106, 107 (1933).


The pivotal issue in the case *sub judice* is whether Ford is subject to the

jurisdiction of the courts of this State. "Where a court lacks jurisdiction over a nonresident

defendant, prohibition is the appropriate remedy to prevent further prosecution of the suit."

*Pries v. Watt,* 186 W. Va. 49, 53, 410 S.E.2d 285, 289 (1991). *See also Norfolk S. Ry. Co.*

*v. Maynard*, 190 W. Va. 113, 120, 437 S.E.2d 277, 284 (1993) (observing that writ of

prohibition is traditional method used in challenge to denial of motion to dismiss for lack of

personal jurisdiction). This Court has explained:

> """The standard of jurisdictional due process is that a
> foreign corporation must have such minimum contacts with the
> state of the forum that the maintenance of an action in the forum
> does not offend traditional notions of fair play and substantial
> justice." Syllabus Point 1, *Hodge v. Sands Manufacturing Co.,*
> 151 W. Va. 133, 150 S.E.2d 793 (1966).' Syllabus Point 1, *Hill*
> *by Hill v. Showa Denko, K.K.*, 188 W. Va. 654, 425 S.E.2d 609
> (1992), *cert. denied*, [508] U.S. [908], 113 S.Ct. 2338,

7

124 L. Ed. 2d 249 (1993)." Syl. pt. 1, *Norfolk Southern Ry. Co. v. Maynard*, 190 W. Va. 113, 437 S.E.2d 277 (1993).

Syl. pt. 6, *State ex rel. Bell Atl.-W. Va., Inc. v. Ranson*, 201 W. Va. 402, 497 S.E.2d 755 (1997).

Generally, this Court reviews findings of fact for clear error and conclusions of law *de novo.* Ostensible findings of fact, which entail application of law or constitute legal judgments that transcend ordinary factual findings, must be reviewed *de novo*. *See* Syl. pt. 1, *State ex rel*. *Cooper v. Caperton*, 196 W. Va. 209, 470 S.E.2d 162 (1996). Guided by these standards*,* we proceed to consider the parties' arguments.

## III.

### DISCUSSION

Ford, a Delaware corporation with its principal place of business in Michigan, seeks to prohibit enforcement of the trial court's orders of October 5 and 21, 2015, which denied Ford's motion to dismiss for lack of personal jurisdiction.

In Syllabus point 5 of *Abbott v. Owens-Corning Fiberglass Corp*., 191 W. Va. 198, 444 S.E. 2d 285 (1994), *superseded by statute on other grounds as stated in State ex rel. Ford Motor Co. v. Nibert*, 235 W. Va. 235, 773 S.E.2d 1 (2015), this Court, relying, in part,

8

on *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 290, 100 S. Ct. 559, 563, 62 L. Ed. 2d 490 (1980), determined that

> [a] court must use a two-step approach when analyzing whether personal jurisdiction exists over a foreign corporation or other nonresident. The first step involves determining whether the defendant's actions satisfy our personal jurisdiction statutes set forth in *W.Va.Code*, 31-1-15 [2015] and *W.Va.Code*, 56-3-33 [2012]. The second step involves determining whether the defendant's contacts with the forum state satisfy federal due process.

Syl. pt. 5, *Abbott*, 191 W. Va. 198, 444 S.E.2d 285. In accordance with this holding, we begin our analysis of this case with an examination of West Virginia's long arm statutes. We then undertake an analysis of personal jurisdiction in the context of due process, which will include discussions of both general and specific jurisdiction. Finally, we will address the question of whether Ford consented to jurisdiction.

### A. *West Virginia Long Arm Statute*

The State's primary long-arm statute, W. Va. Code § 56-3-33(a) (2008) (Repl. Vol. 2012), confers *in personam* jurisdiction on a nonresident who engages in any one of seven acts enumerated therein:

(1) Transacting any business in this State;

(2) Contracting to supply services or things in this State;

(3) Causing tortious injury by an act or omission in this State;

9

(4) Causing tortious injury in this State by an act or omission outside this State if he or she regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;

(5) Causing injury in this State to any person by breach of warranty expressly or impliedly made in the sale of goods outside this state when he or she might reasonably have expected such person to use, consume or be affected by the goods in this State: Provided, That he or she also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;

(6) Having an interest in, using or possessing real property in this State; or

(7) Contracting to insure any person, property or risk located within this State at the time of contracting.

West Virginia's second long-arm statute, W. Va. Code § 31D-15-1501(d) (2008) (Repl. Vol. 2015), is more narrow in that it applies to for-profit corporations that are incorporated under a law other than the law of West Virginia. For purposes of asserting jurisdiction, the statute specifies that a foreign corporation will be deemed to be transacting business in West Virginia if the following is met:

(1) The corporation makes a contract to be performed, in whole or in part, by any party thereto in this State;

(2) The corporation commits a tort, in whole or in part, in this State; or

10

(3) The corporation manufactures, sells, offers for sale or supplies any product in a defective condition and that product causes injury to any person or property within this State notwithstanding the fact that the corporation had no agents, servants or employees or contacts within this State at the time of the injury.

The trial court order made no mention of either of these long-arm statutes. Ford addresses the long-arm statutes only in passing and does not appear to challenge the initial applicability of the statutes.

Mr. Wellman bears the burden of establishing personal jurisdiction over Ford. *E.g., State ex rel. Bell Atl.-W. Va. v. Ranson*, 201 W. Va. at 414, 497 S.E.2d at 767. There must be a *prima facie* showing of jurisdiction, and the allegations in the pleadings must be viewed in the light most favorable to the plaintiff. *E.g.*, *Lane v. Boston Sci. Corp.*, 198 W. Va. 447, 452, 481 S.E.2d 753, 758 (1996). The complaint at issue alleges that Ford submitted itself to jurisdiction by several acts including: (1) committing a tortious act in the State by selling and/or delivering a defective motor vehicle or its component parts for placement into the West Virginia stream of commerce for ultimate users; (2) manufacturing, testing, selling, distributing, assembling, and servicing Ford autos and component parts to or for persons, firms, and/or corporations in West Virginia through its distributors, wholesalers, and brokers when the Ford vehicles were used by West Virginia consumers in the ordinary course of business; (3) causing the injuries to Jarred Wellman by its acts or

11

omissions; (4) engaging in the solicitation of activities in West Virginia to promote the sale, consumption, use, maintenance, distribution, assembly, and repair of Ford vehicles, including the 2002 Ford Explorer driven by Jarred Wellman; and (5) manufacturing, testing, selling, distributing, or assembling Ford vehicles and component parts, including the 2002 Ford Explorer, with knowledge or reason to foresee that Ford vehicles would be shipped in interstate commerce and would reach the market of West Virginia users or consumers. Additionally, Mr. Wellman alleged that Ford transacts business and derives substantial revenues from business within the State of West Virginia and Wyoming County such that it is susceptible to personal jurisdiction. Mr. Wellman also asserted that, at the time the Ford Explorer was introduced into the stream of commerce, it was not merchantable and was not safe as it was not fit for the particular purpose for which it was intended to be used.

Plainly, Mr. Wellman set forth sufficient allegations in the complaint such that he asserted a *prima facie* case of jurisdiction as to Ford in West Virginia under both the general long-arm statute, W. Va. Code §§ 56-3-33(a)(1)-(5), and the corporation-specific long-arm statute, W. Va. Code §§ 31D-15-1501(d)(1) and (3). However, this conclusion does not end the inquiry. The second step requires undertaking an analysis to determine whether Ford's contacts with West Virginia are such that the maintenance of the suit does not offend constitutional due process concerns of fair play and substantial justice.

12

### B. Due Process

The Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state court's authority to proceed against a defendant because the assertion of jurisdiction subjects defendants to the state's coercive power. *Shaffer v. Heitner*, 433 U.S. 186, 216, 97 S. Ct. 2569, 2586, 53 L. Ed. 2d 683 (1977). Personal jurisdiction protects an individual liberty interest and represents a restriction on judicial power. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S. Ct. 2099, 2104, 72 L. Ed. 2d 492 (1982). As this Court has held,

> [t]he Due Process Clause of the Fourteenth Amendment to the United States Constitution operates to limit the jurisdiction of a state court to enter a judgment affecting the rights or interests of a nonresident defendant. This due process limitation requires a state court to have personal jurisdiction over the nonresident defendant.

Syl. pt. 1, *Pries v. Watt*, 186 W. Va. 49, 410 S.E2d 285 (1991).

It is well-established that a state may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 2d 95 (1945) (citation omitted). The due process standard for determining whether a court may exercise personal jurisdiction over a nonresident depends on whether the defendant's contacts with the forum state provide the basis for the suit. As

13

we discuss in detail below, such personal jurisdiction may be either general or specific. General jurisdiction, also known as all-purpose jurisdiction, applies in those situations where the cause of action is distinct from and is not related to a non-resident defendant's contacts with a forum. Specific jurisdiction, also known as case-linked jurisdiction, refers to jurisdiction which arises out of or relates to the defendant's contacts with a forum. In other words, general jurisdiction is dispute blind, while specific jurisdiction requires the activities of the nonresident defendant in the forum be related to or give rise to the liabilities sued on. At this stage of the litigation, Mr. Wellman attempts to invoke both general and specific jurisdiction.[3] Before individually addressing the concepts of general and specific jurisdiction, however, we begin by discussing the opinion of the United States Supreme Court in *Daimler AG v. Bauman*, ___ U. S. ___, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014), along with a review of the history of personal jurisdiction.

**1. *Daimler AG v. Bauman*.** Ford asserts that, under *Daimler AG v. Bauman*, ___ U.S.___, 134 S. Ct. 746, 187 L. Ed. 2d 624, it cannot be subjected to general personal jurisdiction in West Virginia because it has no manufacturing plants, offices, or agents in West Virginia. Additionally, Ford claims to be wholly independent from the dealers in the State that sell and service Ford vehicles. The assertion by Ford commands that we consider

[3]It is observed that the amici define the case at issue differently. The West Virginia Chamber of Commerce addresses the issue through the lens of general jurisdiction. The Center for Auto Safety and The Attorney's Information Exchange Group analyze the issue as one involving only specific jurisdiction.

14

the *Daimler* opinion which, Mr. Wellman argues, did not overrule longstanding precedent and is distinguishable from the present circumstances.

*Daimler* involved an unusual fact setting with no connection whatsoever to the United States. In *Daimler,* twenty-two Argentinian residents filed a complaint in federal district court in California against Daimler Chrysler Aktiengesellschaft ("Daimler"), a German company that manufactures Mercedes-Benz automobiles in Germany. The complaint alleged that, in the late 1970s and early 1980s, during what is known as Argentina's "Dirty War," Daimler's Argentinian subsidiary collaborated with state security forces to kidnap, detain, torture, and kill Argentinian workers at the subsidiary facility. Jurisdiction in California was predicated on the California contacts of a Daimler subsidiary incorporated in Delaware with a principal place of business in New Jersey. The subsidiary distributed vehicles manufactured by Daimler throughout the United States, including California. California had no connection to the atrocities, the perpetrators of the atrocities, or the victims. The Argentinian plaintiffs invoked general jurisdiction. The federal district court dismissed for lack of general personal jurisdiction. Initially, the Ninth Circuit Court of Appeals affirmed. It subsequently reconsidered and reversed, holding that Daimler had continuous and systematic contacts with California and that the exercise of personal jurisdiction would be fair and reasonable.

In an opinion authored by Justice Ginsburg, the United States Supreme Court held in *Daimler* that due process did not permit the exercise of general jurisdiction over the corporation in California. Indeed, the opening sentence of the opinion foreshadowed the conclusion that jurisdiction would not be appropriate: "This case concerns the authority of a court in the United States to entertain a claim brought by foreign plaintiffs against a defendant based on events occurring entirely outside the United States." *Daimler,* ___U.S. at ___, 134 S. Ct. at 750, 187 L. Ed. 2d 624. The question presented was stated as "whether the Due Process Clause of the Fourteenth Amendment precludes the District Court from exercising jurisdiction over Daimler in this case, given the absence of any California connection to the atrocities, perpetrators, or victims described in the complaint." *Daimler*, ___U.S. at ___, 134 S. Ct. at 751, 187 L. Ed. 2d 624.

The *Daimler* opinion began with an extensive discussion of the history of personal jurisdiction beginning with *Pennoyer v. Neff*, 95 U.S. 714, 24 L. Ed. 565 (1878), *overruled in part*, *Shaffer v. Heitner*, 433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977), which held, in formalistic territorial fashion, that a "tribunal's jurisdiction over persons reaches no farther than the geographic bounds of the forum." *Daimler*, ___U.S. at ___, 134 S. Ct. at 753, 187 L. Ed. 2d 624. As observed by the *Daimle*r majority, the strict territorial approach gave way to a less rigid concept that was informed by advances in modern technology, transportation, communication, and the growth of interstate commerce. *Daimler*,

16

___U.S. at ___, 134 S. Ct. at 753, 187 L. Ed. 2d 624. *International Shoe v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945), was cited as the "canonical opinion" regarding personal jurisdiction. *Daimler,* ___U.S. at ___, 134 S. Ct. at 754, 187 L. Ed. 2d 624.

As it did the United States Supreme Court, it serves our analysis to recall the teaching of personal jurisdiction precedent beginning with *International Shoe*, which involved an action by the State of Washington to collect payments to the State's unemployment fund. International Shoe was a Delaware corporation with a principal place of business in St. Louis, Missouri. The business was the manufacture and sale of shoes. International Shoe had no office, maintained no inventory, and made no delivery of goods in Washington. It had several salesmen in Washington who it claimed were independent. The salesmen lived in Washington, their activities were confined to Washington, and they were compensated by commission based on sales. They had a line of samples to display to potential buyers. Prices were fixed by International Shoe. The salesmen sent orders to St. Louis, and the items were shipped to buyers with invoice made at the place of shipment.

The State of Washington sent notices of unemployment compensation fund assessments to the salesmen and copies to International Shoe in St. Louis. International Shoe appeared before the unemployment office and challenged the assessments on the basis of the

lack of personal jurisdiction. The Washington tribunals rejected the challenge, ruling that the State was entitled to recover the unpaid contributions.

In establishing what plainly continues to be the "canonical opinion" in the area of personal jurisdiction, the United States Supreme Court rejected the arguments of International Shoe that its activities in Washington were not sufficient to manifest its presence there. The Court held that, with respect to a defendant who is not found to be present in the territory, "due process requires only that . . . he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S. Ct. at 158, 90 L. Ed. 95. The activities or contacts with the forum must be such to make it reasonable to require a corporation to defend in the forum. *Id.* Furthermore, it was noted that presence in a forum has never been doubted "when the activities have not only been continuous and systematic, but also give rise to the liabilities sued on, even though there was no consent to be sued or authorized agent for service of process." *Id.* at 317, 66 S. Ct. at 159, 90 L. Ed. 95. It was specifically observed that no bright line existed by which activities that justify jurisdiction and those that do not are easily distinguished. The analysis is not mechanical or quantitative. Instead, "[w]hether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws." *Id.* at 318, 66 S. Ct. at 159, 90 L. Ed. 95.

18

As Justice Ginsburg's opinion in *Daimler* notes, after *International Shoe*, "the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the states on which the rules of *Pennoyer* rest, became the central concern of the inquiry into personal jurisdiction." *Daimler*, ___U.S. at ___, 134 S. Ct. at 754, 187 L. Ed. 2d 624. Significantly, the *Daimler* opinion also noted that *International Shoe* is the foundation for the two categories of personal jurisdiction. One category of personal jurisdiction is general which involves "situations where a foreign corporation's continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Daimler*, ___U.S. at ___, 134 S. Ct. at 754, 187 L. Ed. 2d 624 (citations omitted). *International Shoe* involved an exercise of specific jurisdiction in that the minimum contacts with the forum gave rise to the asserted causes of action. *Daimler*, ___U.S. at ___, 134 S. Ct. at 754, 187 L. Ed. 2d 624. We will further discuss separately the two types of personal jurisdiction, beginning with general jurisdiction.

**2. General Jurisdiction.** The *Daimler* opinion noted that it had addressed very few general jurisdiction issues since *International Shoe*. Indeed, it was observed that the decision in *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S. Ct. 413, 96 L. Ed. 485 (1952), "remains the textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit." *Daimler,* ___U.S. at ___, 134

19

S. Ct. at 755-56, 187 L. Ed. 2d 624.  In *Perkins*, the plaintiff was an Ohio resident who sued

Benguet in relation to its alleged failure to issue a stock certificate.  The cause of action did

not arise out of anything done in Ohio.  Benguet was incorporated in the Philippines where

it owned and operated gold and silver mines.  Its operations were halted during the Japanese

occupation of the Philippines.  The president, who was also the company's manager and

principal shareholder, left the Philippines and returned to a home in Ohio.  He maintained

an office for personal affairs and kept the files of Benguet in Ohio.  He also carried on the

correspondence of Benguet, drew a salary, and paid two secretaries.  A bank account was

maintained in Ohio.  The activities of Benguet were limited by the occupation.  There was

no mining property in Ohio.  Benguet had no license to transact business in Ohio and had no

designated agent for service of process.  At the time the case was brought, the occupation

was over.  The *Perkins* opinion noted that Benguet's contacts with Ohio were limited and

indicated that the case took the jurisdictional issue one step further than *International Shoe*

due to the fact that the cause of action did not arise out of any activities of the corporation

in the forum state.  Nevertheless, the *Perkins* majority found that Ohio could exercise general

jurisdiction over Benguet without offending due process.

Following *Perkins,* the next general jurisdiction case on point and discussed

in *Daimler* was *Helicopteros Nationales de Columbia, S.A. v. Hall*, 466 U.S. 408, 104 S. Ct.

1868, 80 L. Ed. 2d 404 (1984).  *Helicopteros* arose from a helicopter crash in Peru in which

20

four United States citizens were killed. The four were employed by a Peruvian consortium and were working on a pipeline. A wrongful death suit was brought in Texas state court against Helicopteros, the owner and operator of a Columbian company. Helicopteros was not authorized to do business in Texas, had no agent for service of process in Texas, performed no operations in Texas, sold no products in Texas, solicited no business in Texas, had no employees in Texas, and had no real or personal property, offices, records, or shareholders in Texas. Helicopteros' contacts with Texas were limited to "sending its chief executive to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment and training services from [a Texas-based helicopter company] for substantial sums; and sending personnel to [Texas] for training." *Daimler,* ___U.S. at ___, 134 S. Ct. at 757, 187 L. Ed. 2d 624. The parties all agreed that the case did not arise out of and was not related to any of Helicopteros' activities in Texas, and, therefore, specific jurisdiction was not applicable. The Court ultimately held that mere purchases within the forum state were not enough to warrant the exercise of general personal jurisdiction over a non-resident.

Finally, the Court in *Daimler* analyzed and relied upon *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011), wherein the Court found that foreign subsidiaries of a United States parent corporation are not amenable to suit in state court on claims which were unrelated to any activity of the

21

subsidiaries in the forum state, because they did not have a sufficient affiliation with the forum state. In *Goodyear*, a bus carrying young soccer players from North Carolina turned over on a road outside Paris, France. The bus rollover was attributed to a tire that had failed. The tire was manufactured in Turkey at the foreign subsidiary of The Goodyear Tire and Rubber Company ("Goodyear"), an Ohio corporation. The plaintiffs filed suit in North Carolina and named as defendants Goodyear and its Turkish, French, and Luxembourgian subsidiaries. The three foreign subsidiaries lacked any affiliation with North Carolina. An extremely small percentage of specialized tires manufactured by Goodyear's foreign subsidiaries for use in such goods as boat and horse trailers made their way into North Carolina. On that ground, the North Carolina Court of Appeals found that the subsidiaries were amenable to the general jurisdiction of North Carolina courts.

The United States Supreme Court reversed. It observed that North Carolina failed to recognize the distinction between case-specific and all-purpose or general jurisdiction. The Court noted that a defendant placing a product in the stream of commerce was a factor relevant in an analysis applicable to specific jurisdiction, but did not warrant a determination that a forum has general jurisdiction in a case unrelated to that activity. Additionally, the connections were found to be too attenuated to support general jurisdiction in North Carolina. The decision in *Goodyear* provided that a court may assert general jurisdiction over out-of-state corporations only where "their affiliations with the [forum]

State are so 'continuous and systematic' as to render them essentially at home [there]."

*Goodyear*, 564 U. S. at 919, 131 S. Ct. at 2851, 180 L. Ed. 2d 796.

With that historical background, the Court in *Daimler* found that "Daimler's slim contacts with the State hardly render it at home there."  *Daimler,* ___U.S. at ___, 134 S. Ct. at 760, 187 L. Ed. 2d 624.  The analysis was not whether the foreign corporation's contacts within a forum can be said to be continuous and systematic in some way, but rather, whether the affiliations with the forum are so continuous and systematic as to render the corporation at home in the state.  *Id.*  Under the facts of the "Argentinian-rooted case," it would amount to an "exorbitant exercise" of all-purpose jurisdiction to find Daimler at home in California.  *Id.* at ___, 134 S. Ct. at 761, 187 L. Ed. 2d 624.

Based upon the foregoing discussion, this Court holds that a court may assert general personal jurisdiction over a nonresident corporate defendant to hear any and all claims against it when the corporation's affiliations with the State are so substantial, continuous, and systematic as to render the nonresident corporate defendant essentially at home in the State.

In the instant matter, Ford, citing *Daimler*, argues that it is not "at home" in West Virginia and cannot be subjected to general personal jurisdiction in this State.  Ford

asserts, and offers supporting affidavits to the effect, that it has no manufacturing plants, offices, or agents in West Virginia. It further claims that it is independent from the Ford dealers in West Virginia that sell and service Ford vehicles. We note that, while referencing dealership contracts to argue that it is independent from Ford dealerships in West Virginia, Ford failed to provide a copy of any such contract for full review and consideration. We further observe that, in its cross-claim against Ford, Ramey alleges that it is party to a contract with Ford wherein Ford agreed to provide Ramey with indemnification and a defense in litigation such as Mr. Wellman's.

Mr. Wellman looks to the long-standing precedent of *Perkins* and *Helicopteros* to support his argument that Ford is subject to general jurisdiction in West Virginia. It is argued by Mr. Wellman that *Daimler* is highly distinguishable from the facts at issue here. Mr. Wellman also contends that *Daimler* did not overrule or reject the rules or reasoning of *International Shoe*, *Perkins*, or *Helicopteros* relating to the assertion of general jurisdiction.

Our analysis of the issue of general jurisdiction leads us to conclude that the "canonical" principles of *International Shoe* and the "textbook" case of *Perkins* were reaffirmed in *Daimler*. Specifically, the *Daimler* opinion does not completely preclude jurisdiction over corporations outside the paradigm of the state of incorporation and the principal place of business. Clearly, the place of incorporation and the principal place of

24

business are the exemplar places of general jurisdiction. However, the *Daimler* Court

explained:

> We do not foreclose the possibility that in an exceptional case, *see*, *e.g., Perkins* . . ., a corporations's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in the State. But this case presents no occasion to explore that question, because Daimler's activities in California plainly do not approach that level. It is one thing to hold a corporation answerable for operations in the forum State, . . . quite another to expose it to suit on claims having no connection whatever to the forum State.

*Daimler*, ___ U.S. at ___ n.19, 134 S. Ct. at 761 n.19, 187 L. Ed. 2d 624 (citations omitted).


To further clarify the general jurisdiction inquiry, the Court in *Daimler* stated

that the focus is not "solely on the magnitude of the defendant's in-state contacts." *Daimler,*

___ U.S. at ___ n.20, 134 S. Ct. at 762 n.20, 187 L. Ed. 2d 624. Instead, there must be an

"appraisal of a corporation's activities in their entirety, nationwide and worldwide." *Id.* The

point was that general jurisdiction was not merely synonymous with "doing business" tests

that evolved prior to *International Shoe* and the recognition of specific jurisdiction.


We also observe that the Court in *Daimler* paid significant attention to the

"transnational context" of the dispute. The Court found that the Ninth Circuit "paid little

heed to the risks to international comity its expansive view of general jurisdiction posed."

*Daimler*, ___ U.S. at ___, 134 S. Ct. at 763, 187 L. Ed. 2d 624. The Court remarked that

other nations do not share such an expansive view of jurisdiction. The Court gave due deference and consideration to the information provided by the Solicitor General that the objections of foreign governments to the approach of the United States to general jurisdiction had "impeded negotiations of international agreements on the reciprocal recognition and enforcement of judgments." *Id.* Thus, the Court commented that the "considerations of international rapport" reinforced the determination that subjecting Daimler to general jurisdiction with respect to a suit on claims having "no connection whatever to the forum State" would not be in accord with due process demands of "fair play and substantial justice." *Id.*

Notably, *Daimler*, *Goodyear,* and *Helicopteros* all involved international considerations. Daimler was a German corporation, and every act complained of took place not only outside California, but also outside the United States. *Goodyear* involved Turkish, French, and Luxembourgian entities, and the product defect complained of manifested in injury in France. There were no corporate affiliations in North Carolina. Similarly, *Helicopteros* involved a Columbian company, activities resulting in deaths in Peru, and mere purchases in Texas that were unrelated to the cause of action.

In the instant matter, we are not confronted with issues of international rapport, friction, or comity. Additionally, the alleged defect manifested itself in West Virginia and

26

resulted in the death of a West Virginia resident who purchased the allegedly defective product in West Virginia. Thus, the fact setting is unlike those confronted by the United States Supreme Court in *Daimler*, *Helicopteros*, or *Goodyear*.

However, we are unable to undertake the kind of analysis required to make a determination regarding the application of general jurisdiction. The trial court failed to conduct an appropriate analysis of the issues including the due process requirements relevant to general jurisdiction. It appears that the trial court applied a "doing business" approach rather than conducting an appraisal of the nature and substance of Ford's operations. The trial court's order also focused on the plaintiff's relationship with the forum rather than that of the defendant. Most concerning is the fact that the trial court "jumped the gun" and entered orders with no opportunity for Mr. Wellman to respond to the substantive argument, meet the affidavits of the Ford witnesses, submit material to become part of the record, or engage in any jurisdictional discovery.

As this Court has established,

> [w]hen a defendant files a motion to dismiss for lack of personal jurisdiction under W. Va. R. Civ. P. 12(b)(2), the circuit court may rule on the motion upon the pleadings, affidavits and other documentary evidence or the court may permit discovery to aid in its decision. At this stage, the party asserting jurisdiction need only make a *prima facie* showing of personal jurisdiction in order to survive the motion to dismiss. In determining whether a party has made a *prima facie* showing

27

of personal jurisdiction, the court must view the allegations in the light most favorable to such party, drawing all inferences in favor of jurisdiction. If, however, the court conducts a pretrial evidentiary hearing on the motion, or if the personal jurisdiction issue is litigated at trial, the party asserting jurisdiction must prove jurisdiction by a preponderance of the evidence.

Syl. pt. 4, *Bell Atlantic-W. Va.,* 201 W. Va. 402, 497 S.E.2d 755.

The Court in *Bell Atlantic-W. Va.* also recognized that, in those instances when a nonresident defendant files a motion to dismiss challenging personal jurisdiction and offers "affidavits or depositions, . . . the party resisting such motion may not stand on its pleadings [but] must come forward with affidavits or other proper evidence detailing specific facts demonstrating that the court has jurisdiction over the defendant." *Id.*, 201 W. Va. at 415, 497 S.E.2d at 768 (citations omitted).

The trial court's orders, entered prior to the time Mr. Wellman was to respond to the motion to dismiss and prior to the scheduled and noticed hearing on the motion, deprived Mr. Wellman of any opportunity to "come forward with affidavits or other proper evidence detailing specific facts demonstrating that the court has jurisdiction over" Ford. *Id.* The trial court's orders are deficient in the conclusory finding that Ford was subject to jurisdiction. Thus, this Court is confronted with an essentially blank record that does not afford us the necessary factual information to consider whether the instant case is one in

28

which Ford's operations in West Virginia are so "continuous and systematic" as to render it "at home" in West Virginia.

We note that Mr. Wellman has pointed to numerous facts outside the record that he contends support general jurisdiction. These include the establishment of a network of West Virginia Ford dealers; financing of West Virginia Ford dealers; financing of West Virginia consumers; promoting sales incentives and rebate programs with West Virginia dealers and consumers; entering into indemnity agreements with dealers; certifying dealers to perform repairs on Ford vehicles; training Ford mechanics and technicians; providing procedures to follow when making repairs on Ford vehicles; sending Ford representatives into the State to assist with warranty matters; sending Ford recall notices to West Virginia residents who own Ford vehicles regardless of whether the vehicle was purchased from a dealer; advertising in West Virginia through web sites, pop-up ads, television ads, radio ads, internet ads, and print ads; requiring dealers to advertise within specified Ford parameters; registering to do business in West Virginia; designating an agent for service of process in West Virginia; requiring dealers to conform to Ford signage and appearance requirements; paying property taxes in various counties in West Virginia; maintaining and operating a joint venture website with West Virginia Ford dealers, either directly or indirectly, in order to promote Ford vehicles and products and sales to West Virginia residents; and actively litigating and defending cases in the State.

It is clear that Mr. Wellman recognizes the challenges presented by the bare record. In his brief to this Court, Mr. Wellman states that, "[c]ontrary to Ford's assertion, the relevant facts are highly disputed, and resolution of the present issue turns primarily on determination of fact. Should this Court determine that further development of the underlying facts is necessary, it may remand this matter to the circuit court for discovery proceedings." Alternatively, Mr. Wellman has suggested that this Court could make use of a special master to address jurisdictional facts. We decline to use such a process. Mr. Wellman made an effort to "informally gather publicly available evidence that demonstrates Ford's contacts with and conduct towards West Virginia" with his motion for leave to submit a supplemental appendix to which Ford objected. We granted the motion, but only insofar as supplementation was permitted with respect to material that already was part of the record of the trial court. The result was that the factual material identified by Mr. Wellman and outlined generically above was not provided. Under the procedural and substantive circumstances, such facts should be developed at the trial court level so that they become a part of the record and inform a fact and law-based analysis of personal jurisdiction. We are compelled to note that our analysis and summary of the informal facts pointed to by Mr. Wellman is not intended to suggest that building a record with some or all of the asserted facts necessarily will lead to a conclusion that general jurisdiction is appropriate as to Ford, but, rather, that Mr. Wellman should have been permitted to provide such proof to inform the circuit court's determination of such jurisdictional issue. We observe that in *State v. Lewis*,

30

188 W. Va. 85, 95, 422 S.E.2d 807, 817 (1992), this Court concluded that an insufficient factual record may foreclose consideration of the issues presented in a writ of prohibition.

Having outlined the constitutional due process boundaries of general jurisdiction as well as the limitations to our review resulting from the lack of a developed record in the case *sub judice*, we now turn our attention to the invocation of specific jurisdiction.

**3. Specific Jurisdiction.** As we earlier indicated, specific jurisdiction is distinguished from general jurisdiction in that the in-state activities of the non-resident defendant give rise to or are related to the cause of action sued on. A footnote in the *Daimler* decision describes in easily understood hypothetical fashion the distinction between the two types of jurisdiction as follows:

> Colloquy at oral argument illustrated the respective provinces of general and specific jurisdiction over persons. Two hypothetical scenarios were posed: First, if a California plaintiff, injured in a California accident involving a Daimler-manufactured vehicle, sued Daimler in California court alleging that the vehicle was defectively designed, that court's adjudicatory authority would be premised on specific jurisdiction. *See* Tr. Of Oral Arg. 11 (Daimler's counsel acknowledged that specific jurisdiction "may well be . . . available" in such a case, depending on whether Daimler purposefully availed itself of the forum). Second, if a similar accident took place in Poland and injured Polish plaintiffs sued Daimler in California court, the question would be one of plain general jurisdiction.

31

*Daimler*, ___ U.S. at ___ n.5, 134 S. Ct. at 754 n.5, 187 L. Ed. 2d 624.

The inquiry in specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, ___U.S.___, ___, 134 S. Ct. 1115, 1121, 188 L. Ed 2d 12 (2014). The specific jurisdiction analysis for determining whether a forum's exercise of jurisdiction over a nonresident defendant meets due process standards is multi-pronged. The first prong requires a determination that the nonresident defendant has minimum contacts with the forum. Establishing minimum contacts involves an examination of whether the defendant purposefully availed itself of the privilege of conducting activities within the forum. Two general methods for assessing minimum contacts for purposes of specific personal jurisdiction are stream of commerce and stream of commerce plus. To meet the second prong, it must be determined that the plaintiff's claims arise out of or relate to the defendant's contacts with the forum. Under the third prong, it must be constitutionally reasonable to assert the jurisdiction so as to comport with fair play and justice. The reasonableness factors were identified in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987), and include considering "the burden on the defendant," "the interests of the forum State," "the plaintiff's interest in obtaining relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and "the shared interest of the several States

in furthering fundamental substantive social policies." *Id.* at 113, 107 S. Ct. at 1033, 94 L. Ed. 2d 92 (internal quotations and citation omitted).

Ford argues that it is not subject to specific jurisdiction in West Virginia because there are no facts establishing that Ford purposefully availed itself of conducting activities in West Virginia. Additionally, Ford asserts that West Virginia has rejected the stream of commerce theory for establishing the purposeful availment prong of specific jurisdiction. Ford also contends that there has been no showing that the claims arose out of or resulted from Ford's activities in the State.

Mr. Wellman argues that Ford is subject to specific jurisdiction in West Virginia because Ford has purposefully directed its conduct toward the State by placing its products in the stream of commerce. He asserts that the stream of commerce theory applies in West Virginia for establishing the purposeful availment prong of specific jurisdiction. Mr. Wellman also contends that whether the facts as to Ford's contacts with West Virginia are analyzed under a stream of commerce approach or a more rigid stream of commerce plus approach, the result would be the same in finding specific jurisdiction. He also argues that, inasmuch as this litigation arises out of claims of vehicle defect resulting in injury, it arises out of Ford's contacts with the State which involve the business of selling Ford vehicles, parts, and accessories and promoting a market within the State for Ford products.

33

The issue of specific jurisdiction requires us to revisit the due process analysis in light of *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed 2d 490 (1980), and its progeny. *World-Wide* is the seminal case addressing specific personal jurisdiction, and it did so in the context of a product liability action. In *World-Wide,* the United States Supreme Court announced the use of the stream of commerce test for purposes of analyzing when a state may subject a foreign manufacturer to jurisdiction within the parameters of the Due Process Clause. The stream of commerce test provides a mechanism for analyzing the purposeful availment prong of specific jurisdiction.

In *World-Wide*, Harry and Kay Robinson purchased a new Audi from Seaway Volkswagen, Inc., a dealer in Massena, New York. The following year, the Robinsons left New York to drive to their new home in Arizona. While driving through Oklahoma, another car struck their Audi in the rear. A fire erupted that severely burned Kay and her two children.

The Robinsons filed a products liability action in state court in Oklahoma against the Audi manufacturer, the importer, the regional distributor, and the retail dealer. Among other things, the Robinsons claimed that their injuries resulted from defective design and placement of the gas tank and fuel system. Notably, the foreign manufacturer and the importer did not contest personal jurisdiction in Oklahoma. The regional distributor, World-

Wide, and the retail dealer, Seaway Volkswagen, Inc. ("Seaway"), challenged personal jurisdiction.

World-Wide was incorporated in New York where it also had its business office. It distributed vehicles, parts, and accessories to retail dealers in New York, New Jersey, and Connecticut. Seaway also was incorporated and had its principle place of business in New York. Neither company engaged in any business in Oklahoma. They did not ship or sell products to, or in, Oklahoma. Further, they did not have agents in Oklahoma to receive service of process, and there was no evidence of any advertising in Oklahoma.

Nevertheless, the Oklahoma courts, relying on the long-arm statute as well as the type of product involved, found that it was foreseeable that the car would be driven in Oklahoma. The United States Supreme Court reversed, finding that it was unreasonable to impose personal jurisdiction under the facts of an "isolated occurrence" and the "fortuitous circumstances" of the car being in Oklahoma.

The case was significant for its development of the stream of commerce approach for analyzing the purposeful availment prong with respect to specific personal jurisdiction. The theory was articulated as follows:

> Hence if the sale of a product of a manufacturer or distributor
> such as Audi or Volkswagon is not simply an isolated

occurrence, *but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those states if its allegedly defective merchandise has there been the source of injury to its owner or to others.* The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the *expectation* that they will be purchased by consumers in the forum State.

*World-Wide Volkswagen*, 444 U.S. at 297-98, 100 S. Ct. at 567, 62 L. Ed 2d 490 (emphasis added).

The Court also reaffirmed that a state court may exercise specific personal jurisdiction over a nonresident defendant so long as minimum contacts exist between the defendant and the forum state. *Id.* at 291, 100 S. Ct. at 564, 62 L. Ed 2d 490. Note was made of the fundamental transformation of the American economy in terms of the nationalization of commerce, modern transportation, and modern communication such that the limits imposed by the Due Process Clause on state jurisdiction "have been substantially relaxed over the years." *Id*. at 292-93, 100 S. Ct. at 565, 62 L. Ed 2d 490. The benchmark for exercising specific personal jurisdiction is not the mere likelihood that a product makes its way into the forum state. "Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 296-97, 100 S. Ct. at 567, 62 L. Ed 2d 490.

The next time that the U.S. Supreme Court dealt with specific jurisdiction in the context of stream of commerce theory in a product liability action was in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92. The case arose out of an incident on an interstate in California. Gary Zurcher was severely injured and his passenger wife was killed when he lost control of his motorcycle and collided with a tractor-trailer. Zurcher alleged that he lost control when his rear tire exploded after a sudden loss of air due to a defect in the tire, tube, and sealant.

Among others, Zurcher sued Cheng Shin Rubber Industrial Co. Ltd. ("Cheng Shin"), the Taiwanese manufacturer of the tube. Cheng Shin filed a cross-complaint seeking indemnification from Asahi Metal Industry Co. ("Asahi"), the Japanese manufacturer of the tube's valve assembly. Subsequently, Chen Shin and other defendants settled their claims with Zurcher, leaving only Cheng Shin's indemnity action against Asahi. Asahi challenged the exercise of personal jurisdiction as inconsistent with the Due Process Clause.

The facts established that Asahi manufactured valve assemblies in Japan, which it sold to Cheng Shin and other tire manufacturers, for use as a component part in finished tire tubes. Asahi's sales to Cheng Shin took place in Taiwan, and shipments went from Japan to Taiwan. Asahi's income from sales to Cheng Shin was 1.24 percent of all income. Cheng Shin represented that approximately twenty percent of its sales in the United

37

States were in California. Cheng Shin purchased valve assemblies from other manufacturers and sold tubes around the world.

Asahi's president filed an affidavit to the effect that it never contemplated that its sales to Cheng Shin in Taiwan would subject it to litigation in California. Additionally, Asahi had no offices, property, or agents in California. Asahi had no website advertising its products and engaged nobody in the United States to promote its products.

The Supreme Court of California found that Asahi knew that some of the valve assemblies sold to Cheng Shin would be in tire tubes sold in California and that it benefitted from the sale of products incorporating its component. The component parts were placed in the stream of commerce, and Asahi was aware that some of those parts would find their way into California. That connection was deemed sufficient for jurisdiction.

The United States Supreme Court reversed. However, the Court was divided in its rationale. In an opinion authored by Justice O'Connor and joined in by Chief Justice Rehnquist and Justices Powell and Scalia, the analysis focused on the stream of commerce and the defendant's purposeful availment of the forum state. The approach taken by Justice O'Connor was set out as follows:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully

directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as a sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the State.

*Asahi*, 480 U.S. at 112, 107 S. Ct. at 1032, 94 L. Ed. 2d 92.

Justice O'Connor's opinion addressed the reasonableness of the exercise of jurisdiction. The burden on Asahi was found to be severe. Not only was the distance between Japan and California noted, the analysis also remarked on the burden placed on a manufacturer who is required to defend in a foreign legal system. The interest of Cheng Shin and California in the exercise of jurisdiction over Asahi was said to be slight in that all that remained was an indemnification claim based on a transaction that took place in Taiwan. Because Cheng Shin was not a California resident, California's interest was significantly diminished as the action was about indemnification rather than safety standards. The fact that the procedural and policy interests of other nations were at issue was also considered to be important.

39

Justice Brennan also authored an opinion that was joined in by Justices White, Marshall, and Blackmun. The Brennan opinion agreed that the exercise of personal jurisdiction over Asahi would not comport with "fair play and substantial justice." However, Justice Brennan disagreed with Justice O'Connor's conclusion that Asahi did not purposefully avail itself of the California market. Rather, the opinion explained that the facts presented one of those rare cases where "fair play and substantial justice" defeat the reasonableness of jurisdiction even though the defendant purposefully engaged in forum activities.

Justice Brennan rejected the notion that in a stream of commerce case a plaintiff would be required to show additional conduct directed toward the forum state in order to establish the exercise of jurisdiction over the defendant. Instead, he articulated the stream of commerce analysis as follows:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward the State.

*Asahi*, 480 U.S. at 112, 107 S. Ct. at 1034-35, 94 L. Ed. 2d 92.

Justice Stevens, joined by Justices White and Blackmun, also wrote a separate opinion. Justice Stevens likewise agreed that California's exercise of jurisdiction over Asahi would be unreasonable and unfair. He saw no reason for any articulation of "purposeful direction," *i.e.,* purposeful availment, or any other test. Justice Stevens suggested that the jurisdictional analysis is "affected by the volume, the value, and the hazardous character" of the goods. *Id.,* 480 U.S. at 112, 107 S. Ct. at 1037, 94 L. Ed. 2d 92. Moreover, Justice Stevens found that, even if one used a purposeful availment analysis in application, given the volume of units delivered, he would be inclined to find that there was "purposeful availment." *Id.*

Thus, in *Asahi,* all of the Justices agreed that jurisdiction over Asahi did not comport with fair play and substantial justice. However, there was no majority reached on the issue of minimum contacts. In summary, in terms of the result, all the Justices agreed that it was not fair or reasonable to advance specific jurisdiction in California in a case including a Taiwanese manufacturer as a plaintiff, a Japanese manufacturer as a defendant, and purely an indemnity dispute concerning a transaction that took place in Taiwan.

It would be more than two decades before the United States Supreme Court revisited the stream of commerce test. Once again, when the Court spoke, it did so in a fractured voice. *J. McIntyre Machinery, LTD. v. Nicastro*, 564 U.S. 873, 131 S. Ct. 2780, 180 L. Ed. 2d 75 (2011), involved a products liability action against a foreign manufacturer, J. McIntyre Machinery ("J. McIntyre"), which was incorporated and operating in England. Robert Nicastro was a New Jersey resident who worked in New Jersey's extensive scrap recycling industry. Mr. Nicastro was severely injured and lost part of his hand while using a three-ton metal shearing machine manufactured by J. McIntyre.

J. McIntyre held both the United States and European patents on the recycling technology. J. McIntyre used an exclusive, independent, U.S. based distributor to sell its machines in the United States. Officials of the company attended and exhibited products at scrap metal trade shows and expositions in various states throughout the United States. At least four of J. McIntyre's machines were in use in New Jersey. J. McIntyre had no office in New Jersey, paid no taxes in New Jersey, owned no property there, did no advertising there, and sent no employees there.

The New Jersey Supreme Court held that J. McIntyre could be sued in New Jersey based upon a stream of commerce analysis. Writing for only a plurality, Justice Kennedy, joined by Chief Justice Roberts, Justice Scalia, and Justice Thomas, reversed,

finding that the exercise of jurisdiction by New Jersey would violate due process. Justice Kennedy observed that the competing opinions in *Asahi* had resulted in confusion.

The Kennedy plurality opinion analyzed purposeful availment utilizing a somewhat modified stream of commerce plus approach similar to that of Justice O'Connor's opinion in *Asahi.* Significantly, the Kennedy opinion remarked that such an analysis "does not by itself resolve many difficult questions of jurisdiction that will arise in particular cases." *J. McIntyre,* 564 U.S. at 885, 131 S. Ct. at 2790, 180 L. Ed. 2d 75. Moreover, the Kennedy opinion acknowledged the necessity of a forum-by-forum and a case-by-case analysis indicating that "the defendant's conduct and the economic realities of the market the defendant seeks to serve will differ across cases, and judicial exposition will, in common-law fashion, clarify the contours of that principle." *Id.* The Kennedy opinion acknowledged that purposeful availment by the defendant can sometimes be shown by the sending of goods into a forum. The transmission of goods permits the exercise of jurisdiction "only where the defendant can be said to have *targeted* the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id*. at 882, 131 S. Ct. at 2788, 180 L. Ed. 2d 75 (emphasis added).

Justices Breyer and Alito joined in an opinion concurring in the judgment that Nicastro failed to meet his burden to demonstrate that it was constitutionally proper to

exercise jurisdiction over J. McIntyre.  The opinion found that the case was readily determined by existing precedents.  Justice Breyer found that the limited facts simply did not provide the minimum contacts between the British manufacturer and the State of New Jersey sufficient to support jurisdiction.  There was no showing that J. McIntyre "delivered its goods into the stream of commerce with the expectation that they will be purchased in New Jersey." *Id.* at 889, 131 S. Ct. at 2791, 180 L. Ed. 2d 75.

Justice Breyer's opinion disagreed with the "plurality's seemingly strict no-jurisdiction rule." *Id.* at 890, 131 S. Ct. at 2793, 180 L. Ed. 2d 75.  The opinion also indicated that Justice Breyer was not persuaded by the "absolutist" approach of the New Jersey Supreme Court, which he viewed as subjecting a producer to jurisdiction for a products liability action if the products are distributed through a system that might lead to the products being sold in any of the fifty states.  *Id.*  Justice Breyer's concurrence is the binding law because there was no majority opinion.  *See Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993, 51 L. Ed. 2d 60 (1977) (when fragmented court decides case, holding may be viewed as that position taken by those members who concurred in judgment on narrowest ground).  Thus, stream of commerce theory for meeting the requirement of purposeful availment remains a viable framework for analyzing whether a nonresident defendant may be subject to specific personal jurisdiction in a forum for tort claims relating to the use of its products by resident plaintiffs.

44

The analysis of Justice Breyer is instructive regarding "modern concerns" and the need for fact-specific review with an understanding of the relevant contemporary circumstances. For instance, in questioning what it means for a defendant to submit to the power of a sovereign or to target a forum, the following was said:

> But what do these standards mean when a company targets the world by selling products from its Web site? And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders? And what if the company markets its products through popup advertisements that it knows will be viewed in a forum?

*J. McIntyre,* 564 U.S. at 890, 131 S. Ct. at 2793, 180 L. Ed. 2d 75.

Finally, Justice Ginsburg, joined by Justice Sotomayor and Justice Kagan, wrote a dissent that, in part, employed an *International Shoe* and *World-Wide* approach of reasonableness and fairness. Justice Ginsburg found that the exercise of jurisdiction by New Jersey was consistent with due process. Adopting terminology of the Kennedy plurality, Justice Ginsburg noted that the manufacturer "targeted" the entire United States as its territory for product development. Accordingly, she reasoned, when a manufacturer or distributor aims to sell its products to customers in several states, it is reasonable to subject it to suit in any one of those states if the product has resulted in injury in the state.

Following *Asahi,* this Court adopted Justice Brennan's *World-Wide Volkswagen* approach to stream of commerce as a method of establishing purposeful availment. *See Hill by Hill v. Showa Denko, K.K.*, 188 W. Va. 654, 425 S.E.2d 609 (1992). *Hill* involved contaminated L-tryptophan drug product that resulted in serious injuries and deaths. The contamination occurred in connection with conversion to a less expensive manufacturing process. As a result of taking the product, Mrs. Hill developed a rare and disabling blood disorder.

The Hills sued their pharmacy; the American supplier of the product to the pharmacy; the raw supplier and American distributor of the drug, Showa Denko America, Inc. ("SDA"); and Showa Denko K.K. ("SDK"), a Japanese corporation located in Tokyo that owned 100 percent of SDA's stock. SDK's manufacturing and research facility was located in Japan. SDK had no offices or places of business in the United States. It owned no property in the United States. SDA's business was purchasing, importing, and reselling SDK's products in the United States. SDA purchased more than ten million dollars worth of product from SDK. When SDK learned of the link between the product and the blood disorder, it directed SDA to immediately cease sales.

The trial court found that jurisdiction was not established as to SDK. This Court reversed after reviewing *International Shoe*, *World-Wide,* and *Asahi*. The Court

46

concluded that "[p]ersonal jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause and can be exercised without the need to show additional conduct by the defendant aimed at the forum state." Syl. pt. 2, in part, *Hill*, 188 W. Va. 654, 425 S.E.2d 609. The analysis regarding jurisdiction did not conclude with the fact that product ended up in West Virginia and injury occurred here. The Court also analyzed the matter with respect to traditional notions of fair play and substantial justice. In so doing, the Court observed that SDK benefitted from its contacts with West Virginia regardless of whether they were direct or indirect through the wholly-owned subsidiary; the nature of the distribution pattern of the product and the profitability of the product; West Virginia's substantial interest in exercising jurisdiction; and the burdens on the plaintiff and on SDK.

Ford argues that this Court rejected the *Hill* stream of commerce approach in *Griffith v. ConAgra Brands, Inc.*, 229 W. Va. 190, 728 S.E.2d 74 (2012), when it held that the Due Process Clause's purposeful direction, *i.e.*, availment, requirement could not be satisfied by placing a product in the stream of commerce. Ford's characterization of *Griffith* constitutes a misreading of the facts, analysis, and holding of that case.

*Griffith* has no application to the question presently before this Court. *Griffith* involved a taxpayer's appeal of assessments of corporation net income tax and business

franchise tax. This Court affirmed a lower court ruling that set aside a tax assessment for unpaid corporation net income tax and business franchise tax relating to royalties received from a foreign licensor that were earned from the nationwide licensing of food industry trademarks and trade names. The circumstances were that the licensor had no physical presence in the State and did not sell or distribute food-related products or provide services in West Virginia. Further, all the trademarked or trade name products were manufactured by unrelated licensees of the foreign licensor outside of West Virginia. The foreign licensor did not direct or dictate how the licensees distributed the products, and the licensees had no retail stores in West Virginia. The Court applied a constitutional analysis of the Due Process and Commerce Clauses as developed in the discrete area of state taxation of foreign corporations.

*Griffith* simply has no bearing on this matter. *Griffith* addresses the considerations in determining when an out-of-state entity has tax liability for economic impact in this State in a field complicated by abstraction. Ford is incorrect in asserting that the stream of commerce theory was rejected. Perhaps Ford's confusion results from the Tax Commissioner's argument that the mere placement of the trademarks and trade names in the stream of commerce was adequate for warranting the tax assessments. The Court referenced Syllabus point 2 of *Hill* and observed that jurisdiction over a Japanese drug manufacturer had been proper since the manufacturer derived substantial revenue in West Virginia from the

48

purchase of its medication in this State. The Japanese manufacturer distributed goods through a wholly-owned American distributor that it had the ability to direct and control. Such ability to direct and control was not the case with the foreign licensee taxpayer in *Griffith.* Plainly, the Court in *Griffith* did not overrule *Hill* and did not in any way disavow Syllabus point 2 of *Hill.* Had the Court chosen to reject stream of commerce as an approach to purposeful availment in a tort action involving product defect claims, it would have overruled *Hill.*

Ford also suggests that even if the stream of commerce test was not rejected in *Griffith,* it should now be abandoned in accordance with decisions by other courts. Ford directs this Court to *Lesnick v. Hollingsworth & Vose Co*., 35 F.3d 939 (4th Cir. 1994), and *In re Celotex Corp. v. Rapid American Corp*., 124 F.3d 619 (4th Cir. 1997), arguing that this Court should follow the Fourth Circuit Court of Appeals and apply a stream of commerce plus analysis.

This Court pays due deference and respect to opinions and analysis of the Fourth Circuit. However, we are not bound to adopt the approach of the Fourth Circuit as to minimum contacts and the use of the stream of commerce analysis for determining the purposeful availment prong of specific jurisdiction. Having determined that this Court has not abandoned the stream of commerce test for determining specific personal jurisdiction in

49

a products liability action, we decline to overrule our precedents to impose a more restrictive test.[4]  This is not to say that plaintiffs are foreclosed from grounding arguments regarding specific jurisdiction in a more restrictive stream of commerce plus approach like the non-binding plurality tests articulated by Justice O'Connor in *Asahi* or Justice Kennedy in *J. McIntyre*, but they are not required to do so.

We observe that some other state appellate courts also have declined to adopt a stricter test subsequent to the *J. McIntyre* decision and have instead concluded that their existing precedent on the stream of commerce test remains good law.  *See, e.g.*, *Book v. Doublestar Dongfeng Tyre Co., Ltd.*, 860 N.W.2d 576 (Iowa 2015) (declining to adopt stream of commerce plus test for jurisdiction in product liability cases); *Jacobsen v. Asbestos Corp. Ltd.*, 119 So. 3d 770, 782 (La. Ct. App. 2013) (concluding that court is free to continue to apply stream of commerce theory); *Butler v. JLA Indus. Equip.*, *Inc*. 845 N.W.2d 834, 846 (Minn. Ct. App. 2014) (distilling principles from *J.McIntyre* and continuing to apply stream of commerce test); *Sproul v. Rob & Charlies, Inc.*, 304 P.3d 18, 33 (N.M. Ct. App. 2012) (because *J.McIntyre* did not result in majority opinion, law using the stream of commerce test

---

[4]In *State ex rel. CSR Ltd. v. MacQueen,* 190 W. Va. 695, 441 S.E.2d 658 (1994), this Court held that West Virginia had personal jurisdiction over a sales agent who introduced asbestos fibers into the stream of commerce knowing that products containing fibers would be distributed throughout the United States.  In Syllabus point 2, the Court held that, "[i]n determining whether our courts have jurisdiction under the stream of commerce theory articulated in *Asahi* . . . , the rule in West Virginia will always be congruent with the outer edge of the due process envelope that, as determined by the Supreme Court of the United States, circumscribes jurisdiction."  *Id*. (citation omitted).

remains binding in New Mexico). Additionally, we note that some federal courts also have continued to apply the stream of commerce test in analyzing the purposeful availment prong of specific jurisdiction. *See, e.g.*, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.,* 753 F.3d 521 (5th Cir. 2014); *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F 3d 174 (5th Cir. 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 644, 187 L. Ed. 2d 420 (2013); *AFTG-TG, LLC v. Nuvoton Tech Corp.*, 689 F. 3d 1358, 1363 (Fed. Cir. 2012).

Continuing in the specific jurisdiction analysis, we next address Ford's assertion that there is no nexus between the allegations of the complaint and the activities of Ford in West Virginia. As to nexus, specific jurisdiction asks whether the litigation results from alleged injuries that "arise out of or relate to" the nonresident defendant's activities in the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 2182, 85 L. Ed. 2d 528 (1985). Ford relies on *Pitts v. Ford Motor Co.*, 127 F. Supp. 3d 676 (S.D. Miss. 2015), as support for the argument that Mr. Wellman cannot establish that his claims arose out of or resulted from any forum-related activities on the part of Ford. Ford contends that because the Ford Explorer was manufactured in Kentucky, sold to a dealer in Florida, and entered West Virginia via a third party, Ford's asserted activities in West Virginia do not have anything to do with the West Virginia claim.

In *Pitts,* the plaintiffs, who were Texas residents, purchased a Ford vehicle from a Ford dealership in Texas. They were injured in an auto accident in Mississippi. The plaintiffs filed a complaint in federal district court in Mississippi contending the vehicle was defective in design, engineering, and manufacturing with respect to the passenger seatbelt and restraint system and the airbag system.

The court found that Ford was amenable to suit under the Mississippi long-arm statutes because the alleged tort was committed, in part, in Mississippi and because the plaintiff's injuries occurred in Mississippi. In analyzing the due process concerns, the court found that Ford was not at home in Mississippi for purposes of general jurisdiction. However, the court next found that the submission of facts and exhibits consisting of such information as the identity of Ford's registered agent for service of process, screen shots of a Ford dealer's website, and promotional videos made it clear that Ford had deliberately targeted Mississippi and purposefully availed itself of the privileges of conducting business in the forum. Thus, the court found that the minimum contacts prong of specific jurisdiction was satisfied. However, the court concluded that there was no nexus between Ford's contacts and the plaintiff's claims. The court focused on the fact that the plaintiffs bought the vehicle in Texas and unilaterally transported it to Mississippi where they claim they were injured as a result of product defects. The focus of the court was narrowly directed at the place of sale.

As Mr. Wellman observes, in the instant matter, both the purchase of the Ford Explorer and the accident resulting in death took place in West Virginia. Thus, the present facts are distinguishable from those in *Pitts*. Also important is that we find the nexus analysis in *Pitts* to be so rigid and formalistic as to undermine the precedent of *World-Wide* and its progeny. We decline to use the place of sale as a *per se* rule to defeat specific jurisdiction. Such an approach ignores even the plurality in *J. McIntyre* that indicated that the inquiry considers both the defendant's conduct and the economic realities of the market the defendant seeks to serve. It also utterly ignores the "targeting" of a forum for the purpose of developing a market. The focus in a stream of commerce or stream of commerce plus analysis is not the discrete individual sale, but, rather, the development of a market for products in a forum. The court in *Pitts* failed to consider the nature of product liability claims.

In support of our conclusion that the *Pitts* analysis is too narrow, we note that underlying the *Daimler* opinion is the perspective that, while application of "specific jurisdiction has been cut loose from *Pennoyer's* sway," the Court has declined to stretch general jurisdiction as far. *Daimler*, ___, U.S. at ___, 134 S. Ct. at 757, 187 L. Ed. 2d 624. The Court noted that specific jurisdiction occupies a place of greater dominance than general jurisdiction. *Id.* at ___, 134 S. Ct. at 758, 187 L. Ed. 2d 624. As she has before, Justice Ginsburg cited academics for the paramount importance of specific jurisdiction. "We do not

53

need to justify broad exercises of dispute-blind jurisdiction unless our interpretation of the scope of specific jurisdiction unreasonably limits state authority over nonresident defendants." *Id*. at ___ n.9, 134 S. Ct. at 758 n.9, 187 L. Ed. 2d 624 (citing Mary Twitchell, *The Myth of General Jurisdiction*, 101 Harv. L. Rev. 610, 676 (1988) (advocating a limited scope for general jurisdiction and a broad, expanded scope for specific jurisdiction)). The nexus interpretation in *Pitts* is one that unreasonably limits state authority such that we decline to apply it.

Our analysis leads us to hold that a court may assert specific personal jurisdiction over a nonresident defendant to hear claims against the defendant arising out of or relating to the defendant's contacts or activities in the state by which the defendant purposefully avails itself of conducting activities in the state so long as the exercise of jurisdiction is constitutionally fair and reasonable. In addition, we hold that the purposeful availment requirement of specific personal jurisdiction ensures that a defendant will not be haled into a jurisdiction as a result of isolated, fortuitous, or random acts. Finally, we hold that the specific personal jurisdiction fairness and reasonableness inquiry may, in appropriate cases, include, but is not limited to, considering the burden on the defendant, the interests of the state, the interest of the plaintiff in obtaining relief, the interstate judicial system's interest in obtaining efficient resolution of controversies, and the shared interests of states in

furthering fundamental substantive social policies. The analysis is case specific, and all factors need not be present in all cases.

Having established the principles of specific jurisdiction and outlined the positions of the parties, our normal course would be to apply the same to the instant matter. However, as with general jurisdiction, this Court finds itself unable to undertake the required fact-based analysis to make a determination as to whether Ford is subject to specific jurisdiction in this State. Our previous discussion regarding the bare record and the deficiencies of the trial court's orders apply equally, if not more so, to the issue of specific jurisdiction. The trial court simply did not address any of the three prongs of specific jurisdiction analysis: (1) the purposeful availment (stream of commerce) requirement; (2) the arising out of or relating to requirement; or (3) the reasonableness requirement. As discussed, these prongs require an analysis whereby the facts are applied to the principles of law.

We next proceed to address the issue of consent raised by Mr. Wellman.

### C. Consent to Jurisdiction

Mr. Wellman argues that Ford consented to the jurisdiction of the circuit court by appearing in that court to file joint stipulation orders regarding discovery matters prior to

filing the motion to dismiss for lack of personal jurisdiction. The discovery stipulations were negotiated between the parties during the period when the matter was stayed in the federal district court. The remand order was entered on September 11, 2015, and filed with the circuit court on September 18, 2015. The stipulated discovery orders use the style of the action as pending in the Circuit Court of Wyoming County, West Virginia. The jurisdictional challenges of Ford are not explicitly preserved by the terms of the orders. An order regarding confidentiality was signed by counsel for Mr. Wellman on July 27, 2015; by counsel for Ramey on August 11, 2015; and by counsel for Ford on September 10, 2015. A stipulated order regarding document access does not indicate the date counsel for the parties signed the document. Both stipulated discovery orders were signed by the trial court judge on September 16, 2015, and filed with the clerk of the court on September 21, 2015. Ford's motion to dismiss was not filed until September 23, 2015. Mr. Wellman asserts that the filing of the stipulated discovery orders amounted to a consent to the jurisdiction of the trial court as it constituted an appearance for matters other than to contest jurisdiction.

*Vanscoy v. Anger*, 203 W. Va. 624, 510 S.E.2d 283 (1998) (per curiam), is cited by Mr. Wellman as support for the argument that Ford consented to jurisdiction by first entering an appearance regarding discovery matters. In Syllabus point 2 of *Vanscoy*, this Court held that "'"[a]t [sic] an appearance in a suit or action for any purpose other than to question the jurisdiction of the court, or to set up a lack of process, or defective service is a

56

general appearance." Syl. pt. 1, *Stone v. Rudolph,* 127 W. Va. 335, 32 S.E.2d 742 (1944).'

Syl. pt. 5, *Lemley v. Barr*, 176 W. Va. 378, 343 S.E.2d 101 (1986)." In *Vanscoy,* the

defendant appeared for matters other than to challenge jurisdiction when he signed a

scheduling order and submitted a joint motion for a continuance. In so doing, this Court held

that he waived his challenge to the jurisdiction of the trial court.

We observe that Rule 12(b)(2) of the West Virginia Rules of Civil Procedure

permits the defense of lack of personal jurisdiction to be asserted in the responsive pleading

or by motion. The former distinctions between special and general appearances no longer

apply. When the objection to personal jurisdiction is timely made, a defendant does not

thereafter waive the defense by further participation. *Teachout v. Larry Sherman's Bakery,*

*Inc.*, 158 W. Va. 1020, 216 S.E.2d 889 (1975).

*Vanscoy* is distinguishable from the facts here inasmuch as the defendant in

*Vanscoy* did not file a motion or responsive pleading raising a challenge to jurisdiction. The

defendant in *Vanscoy* appeared in the litigation by initialing a scheduling order and

submitting a joint motion to the court. Here, Ford properly raised the jurisdictional challenge

in its very first action, which was the removal to federal court. While the better practice may

have been to specifically note the jurisdictional challenge in the agreed discovery orders, the

record does not reflect any action on the part of Ford to waive the challenge to jurisdiction.

57

**IV.**

**CONCLUSION**

Due to the lack of a sufficient factual record, we find that Ford has not shown that it is entitled to a writ of prohibition as requested whereby this Court would dismiss it from the underlying civil action. However, the assertions of Ford regarding its challenge to jurisdiction are of such a significant nature that the parties are entitled to an opportunity to develop the record and submit argument to be considered and determined by the circuit court. Based upon the foregoing, the Petition for a Writ of Prohibition is granted, as moulded, and this matter is remanded with instructions. The trial court is directed to provide Mr. Wellman with an opportunity to meet the affidavit-supported challenge of Ford to the imposition of personal jurisdiction. Upon development of the factual record, the parties shall be afforded an opportunity to submit written memoranda of law, and the trial court shall proceed to analyze and decide the matter in accord with the law, authorities, and principles discussed herein and with due consideration of the arguments of the parties. We observe that we are not dictating whether or to what extent jurisdictional discovery should be permitted as this is a matter to be determined in the first instance by the trial court. Nor are we directing whether there should be an evidentiary hearing on the question of jurisdiction. We simply are remanding this case for the court to undertake the proceedings it deems appropriate and

58

to enter an order analyzing and determining the due process requirements with respect to the challenges to both general and specific personal jurisdiction raised by the parties.

Writ Granted as Moulded.